# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Mark Ducic, | : | Case No. 1:07CV1234 |
| | : | |
| Petitioner | : | Judge James S. Gwin |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Ernie Moore, Warden, | : | |
| | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Respondent | : | |

In this action in habeas corpus, 28 U.S.C. §2254, petitioner challenges the constitutionality of his June 18, 2004 conviction pursuant to a jury trial upon two counts of aggravated murder, the first count bearing a mass murder specification and the second with three additional death penalty specifications, upon which he is serving a sentence of two terms of life imprisonment with no possibility of parole; one count of attempted aggravated murder and one count of conspiracy to commit aggravated murder, which were merged for purposes of sentencing, upon which he is serving a nine year sentence; and fifteen counts of drug trafficking, upon which he was sentenced to seventeen months on twelve of the counts and eleven months on the three remaining counts.  The two life sentences are to be served consecutively, but the remaining prison terms are to run concurrently.

On July 2, 2004 petitioner, acting through new counsel, appealed his convictions to the Ohio

1

Eighth District Court of Appeals, alleging three assignments of error:

> I.  The trial court erred by failing to grant the defendant-appellant's motion for judgment of acquittal pursuant to Rule 29(A), Ohio Rules of Criminal Procedure with respect to counts one and two of the indictment wherein Mark Ducic was charged with the offenses of aggravated murder with specifications relating to the deaths of Barbara Davis and Donald Ehrke, as the State failed to sufficient evidence that Mark Ducic committed those offenses, beyond a reasonable doubt.

> II.  The trial court erred by permitting the introduction into evidence of highly prejudicial "other act" testimony.

> III.  The trial judge erred by imposing consecutive sentences and the explanation justifying these sentences was inadequate.

The appellate court summarized the pertinent procedural history and facts of the case as follows:

> Ducic's convictions result, in part, from his own inability to remain quiet about his role in the deaths of two of his friends.  Although both deaths originally seemed accidental, his boasts that he had caused the deaths reopened investigation into them.

> The first death occurred on August 5, 2001.  That morning, Ducic informed Marie Miller, his ex-wife, over the telephone that he and his current girlfriend, Barbara Davis, had spent the night at Donald Ehrke's house, and they had woken to find Davis was not breathing but foaming at the mouth.  Miller responded frantically; she ordered Ducic to call 911.  Ducic indicated he would.  Nearly an hour later, Ducic made the call, but by that time, Davis was beyond medical aid; she was pronounced dead at the hospital.

> The subsequent autopsy indicated Davis died from a drug overdose, since she had ingested alcohol, Valium, hydrocodone, found in Vicodin, and lethal amounts of oxycodone, found in OxyContin, and cocaine.  David Borez, the Euclid Police detective assigned to investigate Davis' death, thought some circumstances surrounding it seemed suspicious.  First, Ducic did not appear to be upset by his girlfriend's death.

> Indeed, Miller and another female friend arrived on the scene just after Davis' body had been transported to find Ducic unaffected.  He

2

even confided to them he wanted a prostitute.  Ehrke, in contrast, seemed panicked while he sought to clean his house of drug paraphernalia.

Since the circle of friends in which Ducic, Davis and Ehrke moved was highly involved in drug use, Davis' overdose was not out of the realm of possibility.  Ducic, in particular, seemed to enjoy insisting that his friends indulge in various drugs.  Nevertheless, Davis' friends did not know her to use OxyContin, which was one of the drugs found in a lethal amount in her system.

Ducic, on the other hand, used OxyContin often.  Thus, Davis' brother was not alerted when Ducic called him on August 4, 2001, seeking to purchase a highly potent form of the drug.  Ducic made the purchase just before he and Davis left for Ehrke's house that night.

Second, Borez knew that Ducic waited for some time after discovering Davis' condition before summoning emergency services.  Upon speaking with several acquaintances of the couple, Borez found that the relationship was not only violent, but strained.

For instance, during a recent fight, Ducic struck Davis with a car, injuring her legs.  Miller knew that Davis was tired of Ducic taking her money and letting her take the blame for his drug activities.  Moreover, the night before Davis' death, as friends gave them a ride to Ehrke's house, Davis and Ducic argued in the backseat of the car.

Without any particular evidence of "foul play," however, the county coroner ruled Davis' death accidental, and Borez closed the investigation.

The second death occurred on December 17, 2002.  It occurred in the same home as the first; Donald Ehrke was discovered sitting dead in an easy chair in his living room, facing a blank television screen with a remote control in his hand.

This death also looked suspicious for several reasons.  Although Ehrke was obsessive about locking his doors, they were open that morning.  His gun collection was missing.  Moreover, although Ehreke's medical history indicated he took several prescription medications, and he died from a drug overdose, his stomach contained no tablets and his system did not contain his prescription medications.  Instead, Ehrke's blood contained significant amounts of codeine, the antidepressant mirtazapine, the muscle relaxant

3

cyclobenzaprine, cocaine, and Vicodin.

Only one person, Kenny Watson, admitted visiting Ehrke the previous night; Watson noticed Ehrke was not acting like himself. However, Ducic told his drug supplier, Kenny Frost, before the body was discovered that Ehrke was dead.

Prescription cough medicine is composed largely of codeine.  A few days prior to Ehrke's death, Ducic telephoned Miller to ask her to fill her prescription for Hydromet cough syrup because Ehrke was ill.  Miller complied and took the bottle to Ehrke's house.  When Ducic later returned the bottle, it was empty.  Ducic told her Ehrke drank it, but Miller noticed Ehrke did not appear to have done so. The autopsy of Ehrke's body indicated his lungs were infected with pneumonia at the time of his death.

Significantly, Ehrke was the only other person present in his house besides Ducic when Davis died.  Also significantly, approximately a month before Ehrke's death, Ducic learned an indictment had been issued against him.

Ducic initially did not know the exact offense with which he was charged; he told his current girlfriend he assumed Ehrke had "betrayed" him.  However, the charge actually was one of stalking his girlfriend.  Ducic was arrested for this offense and was released on bond on December 5, 2002.  Soon thereafter, Ehrke began to argue with him over a $500 debt.  Within days, Ehrke died.

Ehrke's death raised no immediate investigation; therefore, the county coroner ruled it as accidental.  Ducic went on with his life at his mother's home, partying with friends and supplying drugs to them.

One of the friends who reconnected with Ducic in late 2002 was Brad Weiss.  Weiss knew Ducic from a previous time in prison together.  At the time Weiss rekindled his acquaintance, he worked as a confidential reliable informant to the Cleveland Police Department.  Weiss helped law enforcement personnel to obtain evidence against some well-respected businessmen who engaged in drug trafficking.  Weiss felt no obligation to inform on his friends.

His situation, however, changed in the spring of 2003.  By that time, Weiss had committed several traffic offenses and had unwittingly become involved in a theft of jewelry.  These events placed his parole status in jeopardy.  Seeking to forestall a return to prison,

Weiss told Cleveland Police Detective Greg Whitney, along with Ohio State Pharmacy Board agent Lynn Mudra, that he heard Ducic bragging about killing two people. Ducic had indicated no one knew the murders had been committed.

Whitney and Mudra checked into Weiss' information. After reviewing the circumstances surrounding the deaths of Davis and Ehrke, they implemented a plan with Weiss. Since Ducic trusted Weiss as a drug user, Weiss was sent to make a series of controlled buys at Ducic's home. Additionally, the jewelry theft was used to make Weiss look desperate for a way to maintain his freedom.

An electronic device placed on Weiss' person recorded each of his visits to Ducic's house. Weiss made drug purchases there several times during the summer months of 2003. Whitney and Mudra thus not only discovered that Ducic had access to and could provide each of the controlled substances that the victims' bodies contained, but, further, that Ducic had devised an unsuspected method to kill persons who were known drug users.

In his conversation with Weiss recorded on June 11, 2003, Ducic advised all that was necessary was "to plan ahead a little bit." Since Weiss confided the woman who was going to prosecute him for the theft used OxyContin, Ducic told him that about a month before her desired death, Weiss should "give [her] some Percs, couple some Oxys, then Bam! All of a sudden, you know, she does a 'hot shot'- bam, she is through–they'll say man, she has been partying for six months; man, it was just an accident."

Ducic explained that a "hot shot" was an "overdose" and that he had "this sh– that was included in it." Ducic questioned if Weiss believed "all these people around me are OD'd by accident?" He went on to boast that "two people around me***had it coming," and that he was suspected of causing their deaths, but that "one of the hardest charges to prove is OD."

The following day, Ducic advised Weiss to introduce him to the woman who planned to prosecute for the theft, so he could have "access to her." Ducic reassured Weiss he could "do her" because, "I know I can do it. I can do it anytime. I can do something that has been done twice in the last year and a half. I did two of them and they cannot touch me." Ducic made a similar boast on June 17 in a conversation with Weiss, stating that "Barb" and "Don" both died in "Don's house," and that, although he briefly and been in jail, the "cops***can't do anything to [me]."

On June 28, Ducic repeated his skepticism that Weiss could commit murder because "this is hard core, man; there is [sic] not too many people who can *** [get] away with two murders in the last year and a half in Euclid and they cannot touch me."  Ducic warned Weiss that after committing the act, "they question you," and a person had to know how to act.  Ducic "was crying, [he] played it off so good."

By July 7, 2003, Ducic told Weiss he would do the "hit" for "five thousand."  During a conversation recorded on August 1, Ducic asked Weiss when he wanted it done, told him it was "good" that the intended victim took "Oxys" because an overdose of the "whole bottle" of the "would-be Oxy" he had "in storage" would not be "traceable," and reassured Weiss that if OxyContin were already in the victim's system, her death would not be "suspicious." Ducic encouraged Weiss to think of it as "just an OD."

Whitney and Mudra took the recordings to the county coroner. After listening to portions of them, she changed her rulings in both Davis' and Ehrke's deaths from accidental to homicide.  The detective and the agent also obtained a search warrant for Ducic's home and an arrest warrant for him.  Before he knew what the charges against him were, Ducic protested that the death was "not a murder but a manslaughter."

The grand jury issued an indictment against Ducic that charged him with the following offenses: two counts of aggravated murder, R.C. 2903.01, the first with a mass murder specification, R.C. 2929.04(A)(5), and the second with three additional death-penalty specifications; 1 attempted aggravated murder, R.C. 2903.01/2929.02; conspiracy to commit aggravated murder, R.C. 2903.03/2923.01; and sixteen counts of drug trafficking, R.C. 2925.03.  Ducic remained in jail pending trial.  Even there, he lacked the ability to remain quiet about his role in the deaths of Davis and Ehrke.

Ducic discussed his case with one of his cellmates, Edward Farrell. He stated he "had killed two people and one person he had chased down the street with a knife."

In his conversation with Farrell, Ducic admitted that he "OD'ed [Davis] on a bunch of different types of drugs" because "she was ***getting ready to go to the***police on him," and her death contained some irony because "he got the OxyContin from her brother." He elaborated that he gave her "a bunch of different kinds of narcotics, Percocet, OxyContin, a mixture of stuff," with "crack

6

cocaine."

Ducic admitted Ehrke's death was "done the exact same way," since "he was afraid that Don was going to go to the police about him because Don knew about him killing Barb."  Ducic told Farrell he killed Ehrke "about 16 months later;"  Ducic "went to a basement***mixed a bunch of stuff together and***some of the stuff***didn't even show up in the coroner's report."  Ehrke was a good friend, though, so "the best thing he could do for him***was let him die in his favorite chair."

Ducic further told Farrell how he would defend himself in court by confiding that he planned to convince the jury that he was merely a big talker who lied about things.  Farrell subsequently became a witness against him.  When Ducic discovered the betrayal, he told a corrections officer that he knew where Farrell was and that "he was going to have him taken care of"; the corrections officer took his meaning to be a threat.  Ducic's statement later became the basis for an additional indictment against him in CR 451110.  The two cases ultimately were joined for trial.

Ducic's jury trial took nearly a month to complete.  After hearing the testimony of the witnesses and reviewing all the evidence presented, the jury returned verdicts of guilty on all counts but one count of drug trafficking.  Since the jury, however, subsequently could not reach a unanimous verdict regarding a sentencing recommendation on the two counts of capital murder, the judge sentenced Ducic on these convictions to two consecutive life terms without the possibility of parole.  The terms on the remaining counts were ordered to be served concurrently with each other and with the first two counts.

On August 29, 2005 the appellate court affirmed the convictions and sentences imposed by the trial court.

On October 13, 2005 the petitioner appealed the state appellate court ruling to the Ohio Supreme Court alleging the following sole proposition of law:

**Proposition of Law No. I:** The defendant-appellant's right to due process of law is violated when the cause of death in a homicide prosecution is not proven beyond a reasonable doubt.

On January 25, 2006 the state supreme court denied petitioner leave to appeal and dismissed the

7

appeal as not involving any substantial constitutional question.  Petitioner did not appeal this decision to the United States Supreme Court.

While petitioner's direct appeal was pending, he filed a motion for new trial on October 18, 2004, which was denied on February 2, 2005.  A petition for post-conviction relief filed on November 28, 2005 premised upon the same arguments as raised in the motion for new trial was also denied by the trial court.

On April 25, 2007 the petitioner filed the instant petition in which he raises the following sole claim for relief:

> **A.  GROUND ONE:**  Mark Ducic was denied his rights to due process and a fair trial, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, when there was insufficient evidence to support his conviction.
>
> **Supporting FACTS:** Mr. Ducic's convictions for aggravated murder involved the drug related deaths of Marie Miller and Donald Ehrke.  Both Miller and Ehrke died of drug overdoses, and in both cases, the coroner initially ruled both deaths accidental.  Without making any new findings or considering evidence of the victims' medical histories or use of prescription drugs, the coroner changed both rulings from accidental deaths to homicides.  These changes were based largely on the statements of two convicted felons who testified that Mr. Ducic made statements to them implicating him in the deaths.  No one saw Mr. Ducic commit either alleged murder; the case against him was built almost solely on the statements of these two felons, despite the coroner's initial findings that both deaths were the result of accidental overdoses.

The provisions of the Antiterrorism and Effective Death Penalty Act, "AEDPA," Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996) are controlling herein as the instant petition was filed after the Act's effective date.  Lindh v. Murphy, 521 U.S. 320 (1997).

In light of respondent's concession that there are no issues of untimeliness, failure of exhaustion, or procedural bar in this case, this Court will turn its attention to merits review.

8

The role of a federal district court in habeas corpus is set forth in Title 28 U.S.C. § 2254 (d) which provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has held that the clauses "contrary to" and "unreasonable application of" as found in §2254(d)(1) have independent meanings. Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000). A state court adjudication is deemed as being "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court]." A state court adjudication is deemed as involving an "unreasonable application of clearly established Federal law, as determined by the Supreme Court...as of the time of the relevant state-court decision;" "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principal from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principal to a new context where it should apply." 120 S.Ct. at 1519-1520. In deciphering the "unreasonable application" clause this Court must inquire as to whether "the state court's

9

application of clearly established federal law was objectively unreasonable." Id. at 1521.

The Sixth Circuit Court of Appeals has interpreted the foregoing as holding that even if a federal habeas corpus court determines that a state court incorrectly applied federal law it may not grant relief in habeas corpus unless it finds that the state court ruling was also unreasonable. Simpson v. Jones, 238 F.3d 399, 405 (6th Cir. 2000), citing Machacek v. Hofbauer, 213 F.3d 947, 953 (6th Cir. 2000), cert. denied, 121 S.Ct. 808 (2001).

The standard for addressing an argument that a conviction is not supported by sufficient evidence was enunciated in Jackson v. Virginia, 443 U.S. 307, 319 (1979), as follows: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Accord, McKenzie v. Smith, 326 F.3d 721, 727 (6th Cir. 2003); Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003).  In reaching its determination as to the sufficiency of the evidence this Court may not substitute its determination of guilt for that of the factfinder and may not weigh the credibility of the witnesses.  Herrera v. Collins, 506 U.S. 390, 401-402 (1993);  Jackson v. Virginia, 443 U.S. at 319, n.13; Brown v. Davis, 752 F.2d 1142 (6th Cir. 1985).

That standard has been modified somewhat by §2254(d) in that questions of sufficiency of the evidence are mixed questions of law and fact upon which a writ may be granted only if the adjudication of the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or was based upon "an unreasonable determination of the facts in light of the evidence presented" at petitioner's trial, §2254(d)(2).  Starr v. Mitchell, unreported, Case No. 98-4541, 2000 U.S.App. LEXIS 25646,*9-*10 (6th Cir. October 6, 2000).

The state appellate court reviewed petitioner's claims that he was convicted without

10

sufficient proof and held in pertinent part as follows:

>With respect to his first assignment of error, Ducic claims that the evidence was insufficient to prove that Davis' and Ehrke's deaths were aggravated murders instead of accidents. He essentially contends that since no one actually witnessed him committing the killings, the trial court should have granted his motions for acquittal on these two counts. This court disagrees.

>A defendant's motions for acquittal should be denied if the evidence is such that reasonable minds could reach different conclusions as to whether each material element of the crimes has been proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St. 3d 421, 1997 Ohio 372, 683 N.E.2d 1096; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492; *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184. The trial court is required to view the evidence in a light most favorable to the state. *State v. Martin* (1983), 20 Ohio App.3d 172, 20 Ohio B. 215, 485 N.E.2d 717. Thus, circumstantial evidence alone may be used to support a murder conviction. *State v. Anderson* (May 12, 1994), Cuyahoga App.Nos. 65378, 65379, 1994 Ohio App. LEXIS 2099.

>In this case, Weiss and Farrell testified Ducic admitted committing both murders, explained his motives, told them the means by which he did so, and displayed not regret, but pride in his accomplishment of both deeds. Their testimony concerning Ducic's admissions found support in the autopsy protocols, which detailed the particular drugs found in each victim, the circumstances surrounding each death, and other physical evidence presented in the case.

>Based upon the prodigious amount of evidence produced, the trial court correctly concluded Ducic's guilt of the crimes was for the jury to determine. *State v. Lyman*, Cuyahoga App.No. 83097, 2004 Ohio 1454. His first assignment of error, therefore, is overruled.

Although in finding the evidence sufficient to prove the elements of the crimes charged the state appellate court relied overall on state authorities, it also applied the analysis set forth in Jackson v. Virginia, supra. This Court finds that such analysis neither resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, nor was the decision based upon an unreasonable

11

determination of the facts in light of the evidence presented.  That is particularly true in light of the evidence of petitioner's own extensive taped descriptions of all aspects of the murders, which corroborated physical evidence in the case.  Petitioner's challenge to the state appeals court ruling, premised entirely on disagreement with that court's reliance on the credibility assessment by the jury of the witnesses who testified regarding his admissions, is unpersuasive.  Consequently, this Court finds petitioner's sole claim for relief to be without merit.

It is recommended that the petition be dismissed without further proceedings.


s/DAVID S. PERELMAN
United States Magistrate Judge


DATE:   March 7, 2008



## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

12