UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                              :
MARK DUCIC,                                   :    CASE NO. 1:07-cv-1234
                                              :
       Petitioner,                           :    JUDGE JAMES S. GWIN
                                              :
vs.                                           :    OPINION & ORDER
                                              :    [Resolving Docs. 1, 13, 16, 17.]
ERNIE MOORE, Warden,                          :
                                              :
       Respondent.                           :
                                              :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On April 25, 2007, Mark Ducic filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. 1-1.] On April 27, 2007, the Court referred the case to Magistrate Judge David S. Perelman for a Report and Recommendation, pursuant to Local Rule 72.1. [Doc. 4.] On March 7, 2008, Magistrate Judge Perelman issued a report and recommended that the Court deny the Petition. [Doc. 13.] On March 28, 2008, the Petitioner filed a timely objection to the Report and Recommendation. [Doc. 16.] On April 4, 2008, the Respondent filed a Response to Petitioner's Objections. [Doc. 17.] For the reasons set forth below, the Court **ADOPTS** Magistrate Judge Perelman's Report and Recommendation and **DENIES** Ducic's Petition for Writ of Habeas Corpus.

**I. Background**

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "The applicant shall have the burden

Case No. 1:07-cv-1234
Gwin, J.

of rebutting the presumption of correctness by clear and convincing evidence." *Id.* This presumption of correctness also applies to findings of fact made by a state appellate court based on the trial record. *See Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).

> The Court of Appeals of Ohio, Eighth Appellate District, set forth the facts as follows:
>
> Ducic's convictions result, in part, from his own inability to remain quiet about his role in the deaths of two of his friends. Although both deaths originally seemed accidental, his boasts that he had caused the deaths reopened investigation into them.
>
> The first death occurred on August 5, 2001. That morning, Ducic informed Marie Miller, his ex-wife, over the telephone that he and his current girlfriend, Barbara Davis, had spent the night at Donald Ehrke's house, and they had woken to find Davis was not breathing but foaming at the mouth. Miller responded frantically; she ordered Ducic to call 911. Ducic indicated he would. Nearly an hour later, Ducic made the call, but by that time, Davis was beyond medical aid; she was pronounced dead at the hospital.
>
> The subsequent autopsy indicated Davis died from a drug overdose, since she had ingested alcohol, Valium, hydrocodone, found in Vicodin, and lethal amounts of oxycodone, found in OxyContin, and cocaine. David Borez, the Euclid Police detective assigned to investigate Davis' death, thought some circumstances surrounding it seemed suspicious. First, Ducic did not appear to be upset by his girlfriend's death.
>
> Indeed, Miller and another female friend arrived on the scene just after Davis' body had been transported to find Ducic unaffected. He even confided to them he wanted a prostitute. Ehrke, in contrast, seemed panicked while he sought to clean his house of drug paraphernalia.
>
> Since the circle of friends in which Ducic, Davis and Ehrke moved was highly involved in drug use, Davis' overdose was not out of the realm of possibility. Ducic, in particular, seemed to enjoy insisting that his friends indulge in various drugs. Nevertheless, Davis' friends did not know her to use OxyContin, which was one of the drugs found in a lethal amount in her system.
>
> Ducic, on the other hand, used OxyContin often. Thus, Davis' brother was not alerted when Ducic called him on August 4, 2001, seeking to purchase a highly potent form of the drug. Ducic made the purchase just before he and Davis left for Ehrke's house that night.

Case No. 1:07-cv-1234
Gwin, J.

Second, Borez knew that Ducic waited for some time after discovering Davis' condition before summoning emergency services. Upon speaking with several acquaintances of the couple, Borez found that the relationship was not only violent, but strained.

For instance, during a recent fight, Ducic struck Davis with a car, injuring her legs. Miller knew that Davis was tired of Ducic taking her money and letting her take the blame for his drug activities. Moreover, the night before Davis' death, as friends gave them a ride to Ehrke's house, Davis and Ducic argued in the backseat of the car.

Without any particular evidence of "foul play," however, the county coroner ruled Davis' death accidental, and Borez closed the investigation.

The second death occurred on December 17, 2002. It occurred in the same home as the first; Donald Ehrke was discovered sitting dead in an easy chair in his living room, facing a blank television screen with a remote control in his hand.

This death also looked suspicious for several reasons. Although Ehrke was obsessive about locking his doors, they were open that morning. His gun collection was missing. Moreover, although Ehreke's medical history indicated he took several prescription medications, and he died from a drug overdose, his stomach contained no tablets and his system did not contain his prescription medications. Instead, Ehrke's blood contained significant amounts of codeine, the antidepressant mirtazapine, the muscle relaxant cyclobenzaprine, cocaine, and Vicodin.

Only one person, Kenny Watson, admitted visiting Ehrke the previous night; Watson noticed Ehrke was not acting like himself. However, Ducic told his drug supplier, Kenny Frost, before the body was discovered that Ehrke was dead.

Prescription cough medicine is composed largely of codeine. A few days prior to Ehrke's death, Ducic telephoned Miller to ask her to fill her prescription for Hydromet cough syrup because Ehrke was ill. Miller complied and took the bottle to Ehrke's house. When Ducic later returned the bottle, it was empty. Ducic told her Ehrke drank it, but Miller noticed Ehrke did not appear to have done so. The autopsy of Ehrke's body indicated his lungs were infected with pneumonia at the time of his death.

Significantly, Ehrke was the only other person present in his house besides Ducic when Davis died. Also significantly, approximately a month before Ehrke's death, Ducic learned an indictment had been issued against him.

Ducic initially did not know the exact offense with which he was charged; he told his current girlfriend he assumed Ehrke had "betrayed" him. However, the charge actually

Case No. 1:07-cv-1234
Gwin, J.

was one of stalking his girlfriend. Ducic was arrested for this offense and was released on bond on December 5, 2002. Soon thereafter, Ehrke began to argue with him over a $500 debt. Within days, Ehrke died.

Ehrke's death raised no immediate investigation; therefore, the county coroner ruled it as accidental. Ducic went on with his life at his mother's home, partying with friends and supplying drugs to them.

One of the friends who reconnected with Ducic in late 2002 was Brad Weiss. Weiss knew Ducic from a previous time in prison together. At the time Weiss rekindled his acquaintance, he worked as a confidential reliable informant to the Cleveland Police Department. Weiss helped law enforcement personnel to obtain evidence against some well-respected businessmen who engaged in
drug trafficking. Weiss felt no obligation to inform on his friends.

His situation, however, changed in the spring of 2003. By that time, Weiss had committed several traffic offenses and had unwittingly become involved in a theft of jewelry. These events placed his parole status in jeopardy. Seeking to forestall a return to prison, Weiss told Cleveland Police Detective Greg Whitney, along with Ohio State Pharmacy Board agent Lynn Mudra, that he heard Ducic bragging about killing two people. Ducic had indicated no one knew the murders had been committed.

Whitney and Mudra checked into Weiss' information. After reviewing the circumstances surrounding the deaths of Davis and Ehrke, they implemented a plan with Weiss. Since Ducic trusted Weiss as a drug user, Weiss was sent to make a series of controlled buys at Ducic's home. Additionally, the jewelry theft was used to make Weiss look desperate for a way to maintain his freedom.

An electronic device placed on Weiss' person recorded each of his visits to Ducic's house. Weiss made drug purchases there several times during the summer months of 2003. Whitney and Mudra thus not only discovered that Ducic had access to and could provide each of the controlled substances that the victims' bodies contained, but, further, that Ducic had devised an unsuspected method to kill persons who were known drug users.

In his conversation with Weiss recorded on June 11, 2003, Ducic advised all that was necessary was "to plan ahead a little bit." Since Weiss confided the woman who was going to prosecute him for the theft used OxyContin, Ducic told him that about a month before her desired death, Weiss should "give [her] some Percs, couple some Oxys, then Bam! All of a sudden, you know, she does a 'hot shot'- bam, she is through–they'll say man, she has been partying for six months; man, it was just an accident."

Case No. 1:07-cv-1234
Gwin, J.

Ducic explained that a "hot shot" was an "overdose" and that he had "this sh– that was included in it." Ducic questioned if Weiss believed "all these people around me are OD'd by accident?" He went on to boast that "two people around me***had it coming," and that he was suspected of causing their deaths, but that "one of the hardest charges to prove is OD."

The following day, Ducic advised Weiss to introduce him to the woman who planned to prosecute for the theft, so he could have "access to her." Ducic reassured Weiss he could "do her" because, "I know I can do it. I can do it anytime. I can do something that has been done twice in the last year and a half. I did two of them and they cannot touch me." Ducic made a similar boast on June 17 in a conversation with Weiss, stating that "Barb" and "Don" both died in "Don's house," and that, although he briefly had been in jail, the
"cops***can't do anything to [me]."

On June 28, Ducic repeated his skepticism that Weiss could commit murder because "this is hard core, man; there is [sic] not too many people who can *** [get] away with two murders in the last year and a half in Euclid and they cannot touch me." Ducic warned Weiss that after committing the act, "they question you," and a person had to know how to act. Ducic "was crying, [he] played it off so good."

By July 7, 2003, Ducic told Weiss he would do the "hit" for "five thousand." During a conversation recorded on August 1, Ducic asked Weiss when he wanted it done, told him it was "good" that the intended victim took "Oxys" because an overdose of the "whole bottle" of the "would-be Oxy" he had "in storage" would not be "traceable," and reassured Weiss that if OxyContin were already in the victim's system, her death would not be "suspicious." Ducic encouraged Weiss to think of it as "just an OD."

Whitney and Mudra took the recordings to the county coroner. After listening to portions of them, she changed her rulings in both Davis' and Ehrke's deaths from accidental to homicide. The detective and the agent also obtained a search warrant for Ducic's home and an arrest warrant for him. Before he knew what the charges against him were, Ducic protested that the death was "not a murder but a manslaughter."

The grand jury issued an indictment against Ducic that charged him with the following offenses: two counts of aggravated murder, R.C. 2903.01, the first with a mass murder specification, R.C. 2929.04(A)(5), and the second with three additional death-penalty specifications; 1 attempted aggravated murder, R.C. 2903.01/2929.02; conspiracy to commit aggravated murder, R.C. 2903.03/2923.01; and sixteen counts of drug trafficking, R.C. 2925.03. Ducic remained in jail pending trial. Even there, he lacked the ability to remain quiet about his role in the deaths of Davis and Ehrke.

Case No. 1:07-cv-1234
Gwin, J.

> Ducic discussed his case with one of his cellmates, Edward Farrell. He stated he "had killed two people and one person he had chased down the street with a knife."
>
> In his conversation with Farrell, Ducic admitted that he "OD'ed [Davis] on a bunch of different types of drugs" because "she was ***getting ready to go to the***police on him," and her death contained some irony because "he got the OxyContin from her brother." He elaborated that he gave her "a bunch of different kinds of narcotics, Percocet, OxyContin, a mixture of stuff," with "crack cocaine."
>
> Ducic admitted Ehrke's death was "done the exact same way," since "he was afraid that Don was going to go to the police about him because Don knew about him killing Barb." Ducic told Farrell he killed Ehrke "about 16 months later;" Ducic "went to a basement***mixed a bunch of stuff together and***some of the stuff***didn't even show up in the coroner's report." Ehrke was a good friend, though, so "the best thing he could do for him***was let him die in his favorite chair."
>
> Ducic further told Farrell how he would defend himself in court by confiding that he planned to convince the jury that he was merely a big talker who lied about things. Farrell subsequently became a witness against him. When Ducic discovered the betrayal, he told a corrections officer that he knew where Farrell was and that "he was going to have him taken care of"; the corrections officer took his meaning to be a threat. Ducic's statement later became the basis for an additional indictment against him in CR 451110. The two cases ultimately were joined for trial.

[Doc. 8-14 at 2-10.] The Petitioner offers no evidence to challenge the presumption of correctness.

## II. Procedural History

On August 21, 2003, a grand jury issued an indictment against Mark Ducic, charging him with the following offenses: two counts aggravated murder, the first with a mass murder specification and the second with three additional death-penalty specifications; attempted aggravated murder; conspiracy to commit aggravated murder; and sixteen counts of drug trafficking. [Doc. 8-4 at 1-6.] A jury trial began on May 24, 2004. [Doc. 8-13.] At the close of the Ohio's case, the court denied the Petitioner's motion for a judgment of acquittal. On June 18, 2004, the jury returned verdicts of guilty on all counts except one count of drug trafficking. *Id.* The judge sentenced the Petitioner on

Case No. 1:07-cv-1234
Gwin, J.

the two counts of capital murder to two consecutive life terms without the possibility of parole after the jury was unable to reach a unanimous verdict regarding a sentencing recommendation. [Doc. 8-14 at 11.] The judge ordered the Petitioner to serve the remaining counts concurrently with each other and with the first two sentences. *Id.*

On July 2, 2004, acting through new counsel, the Petitioner appealed his convictions to the Court of Appeals of Ohio, Eighth Appellate District, alleging three assignments of error. [Doc. 8-5.] On August 29, 2005, the Ohio Court of Appeals affirmed the convictions and sentences imposed by the trial court. [Doc. 8-14.] On October 13, 2005, the Petitioner appealed the ruling to the Ohio Supreme Court. [Doc. 8-15.] On January 25, 2006, the Ohio Supreme Court denied the Petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question. *Id. at 34*. His conviction became final on April 25, 2006.

On April 25, 2007, the Petitioner filed the instant petition. [Doc. 1-1.] In his petition, he makes one claim. He states that he was denied his rights to due process and a fair trial, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution because the prosecution presented insufficient evidence to support his conviction.

### III. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), governs the standards of review for state court decisions. The AEDPA provides that federal courts cannot grant a habeas petition for any claim that the state court adjudicated on the merits unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable

Case No. 1:07-cv-1234
Gwin, J.

determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). Moreover, the factual findings of a state court are presumed to be correct. A federal court may only diverge from a state court's factual findings if the petitioner shows by clear and convincing evidence that the findings are erroneous. 28 U.S.C. § 2254(e)(1).

The United States Supreme Court defined the proper application of § 2254(d) in *Williams v. Taylor*, 529 U.S. 362 (2000). Under the "contrary to" clause of § 2254(d)(1), a federal court may grant a habeas petition in two scenarios. *Id.* at 405-07. A state-court decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth" by the Supreme Court or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from our precedent." *Id.* at 405-06. The "federal court must find a violation of law 'clearly established' by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision." *Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may also grant a writ "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The state court's application of federal law must be "objectively unreasonable." *Id.* at 409. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. (emphasis in original). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

-8-

Case No. 1:07-cv-1234
Gwin, J.

The Federal Magistrates Act requires a district court to conduct a *de novo* review only of those portions of the Report and Recommendation to which the parties have objected. 28 U.S.C. § 636(b)(1).

### IV. Analysis

The Petitioner's sole claim for relief is that he was denied his Fifth and Fourteenth Amendment rights to due process and a fair trial because there was insufficient evidence to support the two aggravated murder convictions. Specifically, the Petitioner argues that he was merely present when two acquaintances died from overdoses, and that even if he supplied those drugs and later boasted at having caused those deaths, that does not establish that he committed aggravated murder. [Doc. 16 at 4.] In addition, the Petitioner argues that the scenario he proposed to Brad Weiss for the third killing disproves his involvement in the deaths of Davis and Ehrke because the circumstances are inconsistent. *Id.* at 3-4.

Due process requires a conviction based on sufficient evidence. *See Tibbs v. Florida*, 457 U.S. 31, 45 (1982). Because the Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt," *Fiore v. White*, 531 U.S. 225, 228-29 (2001), "a state law question regarding the elements of the crime predicates enforcement of [the petitioner's] federal constitutional rights." *Richey v. Mitchell*, 395 F.3d 660, 672 (6th Cir. 2005). As a result, a federal court may review an insufficient evidence claim.

When a petitioner challenges the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). If the Court answers this question affirmatively,

Case No. 1:07-cv-1234
Gwin, J.

sufficient evidence supports the conviction. This standard does not permit the Court to make its own subjective determination of guilt or innocence. Rather, the standard recognizes the "responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).

The Petitioner argues that Ohio did not prove his intent, making this case indistinguishable from *Nash v. Eberlin*, 258 Fed. Appx. 761 (6th Cir. 2007). This Court disagrees. The evidence in *Nash* was insufficient to prove that the defendant acted knowingly, an element of felonious assault. Under Ohio law, aggravated murder under O.R.C. §2903.01 is a specific intent crime: the Petitioner must have intended to cause death. The Petitioner admitted causing the deaths of Davis and Ehrke to the confidential informant, Brad Weiss, and one of his cellmates, Edward Farrell. Not only did the Petitioner describe his means and motive, but he also expressed pride in the murders. The Petitioner stated that he killed Davis and Ehrke to keep them from going to the police. *Id*. at 9-10. In contrast to *Nash*, the Petitioner here explained why he had killed the victims–proving his intent. *C.f. McDade v. Russell*, 120 Fed. Appx. 597, 600 (6th Cir. 2005) (finding a confession established more than adequate intent). Finally, circumstantial evidence alone may support a conviction. *See Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006); *Thompson v. Bock*, 215 Fed.Appx. 431, 437 (6th Cir. 2007).

The Petitioner challenges his conviction based on the credibility of Weiss and Farrell, both of whom are convicted felons and, he argues, had self-serving motives in testifying. This Court does not reweigh the evidence or reevaluate witness credibility. The Court grants special deference to state courts in determinations regarding the credibility and demeanor of the parties. *See Brown v.*

Case No. 1:07-cv-1234
Gwin, J.

*Davis*, 752 F.2d 1142, 1147 (6th Cir. 1985). Moreover, "'attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.'" *Martin v. Mitchell*, 280 F.3d 594, 619 (6th Cir. 2002). The jury found Weiss and Farrell credible. The Court must give the jury's finding deference. *See Eskridge v. Konteh*, 88 Fed.Appx. 831, 839 (6th Cir. 2004) (upholding a conviction largely supported by the self-serving, inconsistent testimony of a co-defendant).

Additional circumstantial and physical evidence corroborate the Petitioner's admissions to Weiss and Farrell, further supporting the jury's decision. *See Wilson v. Parker*, 515 F.3d 682, 702 (6th Cir. 2008) (upholding a conviction substantially supported by the defendant's confession to his cellmate and additional circumstantial evidence). The Petitioner frequently supplied drugs to his friends and urged them to indulge in drug abuse. [Doc. 8-14 at 3.] He had a violent relationship with Davis and purchased OxyContin, one of the drugs found in Davis's body, from her brother the night before the murder. *Id*. Significantly, Ehrke was the only person with the Petitioner and Davis when Davis died, lending credence to the testimony that the Petitioner killed Ehrke to keep him from going to the police. *Id.* at 5. The autopsy reports detailing the drugs found in each victim are consistent with the Petitioner's admissions that he "OD'ed" the victims. *Id.* at 3-5. Furthermore, the police verified through Weiss's controlled buys that Ducic had access to and could provide each of the controlled substances found in the victims' bodies. *Id.* at 7. This Court finds that, after viewing this evidence and the Petitioner's own admissions in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Finally, the Petitioner argues that his statements regarding the "hit" prove that he was not involved in the first two murders. This contention is unpersuasive. The lack of OxyContin in Ehrke's

-11-

Case No. 1:07-cv-1234
Gwin, J.

body and the allegation that Davis was not a habitual OxyContin user suggest only that some details of the overdoses varied. They do not prove the Petitioner did not commit these crimes. More significant are the Petitioner's admissions to the first two murders recorded during conversations detailing the scenario for the third killing.

For the foregoing reasons, the Petitioner fails to show that the state court adjudication was (1) contrary to, or based on an unreasonable application of, clearly established federal law, or (2) based on an unreasonable determination of the facts in light of the evidence presented. The Court further finds that the Petitioner has failed to make a substantial showing of a violation of a constitutional right and denies a certificate of appealability on this issue. 28 U.S.C. §2253(c).

### V. Conclusion

For the aforementioned reasons, the Court hereby **ADOPTS** Magistrate Judge Perelman's Report and Recommendation and **DENIES** Ducic's Petition for Writ of Habeas Corpus. Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) that an appeal from this decision could not be taken in good faith, and no basis exists upon which to issue a certificate of appealability. 28 U.S.C. §2253(c).

IT IS SO ORDERED.

Dated: July 17, 2008            s/ *James S. Gwin*
                                                         JAMES S. GWIN
                                                         UNITED STATES DISTRICT JUDGE